AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania 

| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>information associated with jlhiepler@yahoo.com that is<br>stored at premises controlled by Yahoo Inc. | )<br>)<br>)<br>)<br>)<br>) | Case No.  23-mj-1683 |
|---|---|---|

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1344, and 1957 | Wire Fraud; Bank Fraud; and Illegal Monetary Transactions |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Angela Strause, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____Telephone_____ *(specify reliable electronic means).*

Date:  9/22/2023

Lynne A. Sitarski
Digitally signed by Lynne A. Sitarski
Date: 2023.09.22 16:38:44 -04'00'
*Judge's signature*

City and state:  Philadelphia, PA

Honorable Lynne A. Sitarski, Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

Eastern District of Pennsylvania ▼

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>information associated with jlhiepler@yahoo.com that<br>is stored at premises controlled by Yahoo Inc. | )<br>)<br>)  Case No.   23-mj-1683<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____September 27, 2023_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the duty United States Magistrate Judge_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    09/22/2023 3:25 pm

Lynne A. Sitarski
Digitally signed by
Lynne A. Sitarski
Date: 2023.09.22
16:43:43 -04'00'

*Judge's signature*

City and state:      Philadelphia, PA                          Honorable Lynne A. Sitarski, Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>   23-mj-1683 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

                                         _____
                                               *Executing officer's signature*

                                         _____
                                             *Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Angela Strause, Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Yahoo Inc. ("Yahoo"), an email provider located at 391 San Antonio Road, Floors 5 and 6, Mountain View, California, 95040.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

1.       I am a Special Agent with the FBI and have been employed in this capacity since February 2010.  I have investigated federal criminal violations of the United States Code related to drug trafficking, internet crimes against children, human trafficking, wire and mail fraud, kidnapping, and matters related to domestic and international terrorism.  I have received specialized training in investigating matters involving wire, mail, and healthcare fraud, and have become familiar with the methods that individuals use to commit financial crimes, and the evidence commonly possessed and used by those individuals in furtherance of their crimes.  As part of my duties as a Special Agent, I have also interviewed victims, witnesses, and suspects, and

1

have participated in the execution of numerous search warrants involving all manner of violent crimes, white collar crimes, and crimes related to international and domestic terrorism.

2.      As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

3.      The statements in this affidavit are based on my personal investigation and information provided by other law enforcement officers. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts and circumstances of this investigation have been summarized for the specific purposes of this application, and for the limited purpose of establishing that probable cause exists for the search warrant sought herein.

4.      Based on my training and experience and the facts set forth in this Affidavit, there is probable cause to believe that JESSIKA L. HIEPLER ("HIEPLER") operated a scheme to defraud and steal from her former employer, American Legion Post 34, and others, and that HIEPLER committed violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1957 (illegal monetary transactions) (collectively, the "SUBJECT OFFENSES"). There is also probable cause to search HIEPLER's email account with Yahoo as described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes as more particularly described in Attachment B.

### JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE THAT CRIMES WERE COMMITTED

6.      On or about December 16, 2021, detectives from the Lancaster City Bureau of Police ("LPD") contacted the FBI regarding a potential fraud committed against American Legion Post 34 ("Post 34"), located at 1388 Arcadia Road, Lancaster, Pennsylvania.  LPD reported learning of the allegations from E.M., the Commander of American Legion District 10 ("District 10"),[1] which includes Post 34.

7.      The FBI interviewed E.M. in January 2022.  E.M. explained that in mid-October 2021, various Post 34 members had informed him that Post 34 was facing potential closure due to insufficient funds.  According to E.M., the fact that Post 34 was in danger of shutting down due to lack of funding seemed odd because Post 34 had approximately 600 members, and was one of the larger American Legion Posts in District 10.

8.      During this interview, E.M. described the American Legion as a non-profit U.S. military veterans' organization that utilizes membership dues and other donations to cover overhead expenses and then donates any excess funds to various community causes.  According to its website, the American Legion was chartered and incorporated by Congress in 1919 as a patriotic veterans' organization devoted to mutual helpfulness.

9.      E.M. informed the FBI that JESSIKA L. HIEPLER was Post 34's longtime manager, treasurer, and financial officer.

---

[1] E.M. explained to the FBI that American Legion District 10 is comprised of all of the thirteen (13) American Legion Posts located in Lancaster County, Pennsylvania, which includes Post 34.

3

10.    According to the FBI's interview with E.M., along with the FBI's subsequent interviews of three former Post 34 Commanders – J.V. (2013-14), S.W. (2019-20), and J.A. (2009-13, 2021-22) – HIEPLER worked for Post 34 for over a decade and her duties included paying routine bills and conducting audits of Post 34's finances.  These interviewees stated that HIEPLER had signatory authority on all Post 34 bank accounts, was responsible for providing profit and loss statements for Post 34, and generally made all financial decisions concerning operations for Post 34.  In compensation for her duties, HIEPLER received a salary of approximately $60,000 per year.

11.    E.M. and S.W. told the FBI that in Fall 2021, Post 34 members expressed concerns to them regarding Post 34's financial status and HIEPLER's conduct, and that these members also reported these same concerns to Post 34's current Board/Local Leadership.[2]

12.    According to S.W. and J.A., during the October 2021 Post 34 Board Meeting, HIEPLER reviewed Post 34's financials and discussed the financial shortfalls leading to the potential closure of Post 34.

13.    E.M. reported that following the October 2021 Board Meeting, he started to investigate what was causing financial problems for Post 34.  In November 2021, E.M. requested financial information and documentation from Post 34's Board/Local Leadership, and then also requested the same documents directly from HIEPLER, but neither provided a complete set of the requested records.

14.    E.M. explained that in late November 2021, a former employee, R.C., returned to Post 34 and took over as Post 34's Manager from HIEPLER, while HIEPLER remained on staff

---

[2] "Board/Local Leadership" is comprised of the Post 34's Post Commander, Vice Commander, and Adjutant.  According to E.M., S.W., and J.V., Post 34's Adjutant at the time was HIEPLER's father, D.H.

4

as Treasurer.  When interviewed by the FBI, R.C. stated that HIEPLER told her that a desk drawer

from the Manager's office was missing because the drawer had collapsed, and HIEPLER had taken

the drawer home.  R.C. reported that HIEPLER later said the records had been destroyed.  R.C.

stated that the missing drawer is where Post 34's financial records from 2018 and 2019 were stored.

R.C. also reported that HIEPLER removed the computer tower from Post 34 in December 2021,

and replaced it with a new computer.

15.     According to the meeting minutes from the Post 34 Board Meeting on February 16,

2022, E.M. confronted HIEPLER with discrepancies related to various financial transactions and

missing financial records during her tenure, and HIEPLER resigned.

16.     On August 29, 2023, members of the FBI Capital Area Resident Agency executed

a federal search warrant at Docket No. 23-mj-1544 at HIEPLER's residence located at 631

Hedgewick Drive, Lancaster, PA.  The warrant had been issued by the U.S. District Court for the

Eastern District of Pennsylvania on August 28, 2023.

17.     While searching the home office area of HIEPLER's residence, FBI agents located

and accessed a desktop computer identified as belonging to HIEPLER (an HP all-in-one computer

bearing S/N 2TK027004B).  FBI agents observed that the HP computer was operating using files

stored both locally on the computer itself and files within the cloud-based Microsoft OneDrive

("OneDrive") account JLHIEPLER@yahoo.com.    In viewing the main "OneDrive Settings"

screen, FBI agents observed that 46.2 GB of data was being stored on the OneDrive account

JLHIEPLER@yahoo.com.   Several file folder names which were stored in OneDrive were

consistent with entities listed in the residence search warrant.  For example, file folders titled

"AMVETS", "APR", "Housing for Homeless Veterans Paperwork", "LEGION", and "Text

Messages for Legion BS" were noted on HIEPLER's computer desktop as being stored in the cloud-based OneDrive account JLHIEPLER@yahoo.com.

**I.**    **HIEPLER's Cash Withdrawals**

18.    As set forth below, evidence shows that HIEPLER withdrew approximately $238,210 in cash from Post 34's First National Bank of Pennsylvania ("FNB") account ending in #1895, and the missing money has largely not been accounted for.

19.    FNB records show that in March 2018, Post 34 obtained a loan of $400,590 from FNB ("FNB Loan #6015"). On or about March 20, 2018, the loan proceeds were deposited into Post 34's FNB account ending in #1895 ("FNB #1895"). FNB records show that HIEPLER was a signatory on FNB #1895.

20.    According to S.W., the former Post 34 Commander from around the time of the loan, the Post 34 Board/Local Leadership had sought FNB Loan #6015 in order to build an addition on Post 34's facility, and to pay for various repairs, including roofing, plumbing, HVAC, a new bar top, and a tap system.

21.    FNB records show that on March 20, 2018, $11,684.11 of FNB Loan #6015 was used to pay off a Post 34's BB&T loan account ending in #8001 ("BB&T #8001"). Bank records reflect that this authorized transaction was completed by HIEPLER and S.W.

22.    During an interview in January 2022, S.W. estimated that approximately $100,000 of the FNB loan had been used for various authorized repairs, but no building addition had been completed. Bank records for FNB #1895 (the account in which FNB Loan #6015 was deposited) show that two payments were made from the account to "Merk Construction" on April 10 and April 13, 2018, for a total of $115,328.75, which is consistent with S.W.'s estimate regarding use of some loan proceeds for authorized facility repairs.

23.     Bank records for FNB Loan #6015 show that some payments were made on this loan, but as of March 7, 2022, Post 34 had an outstanding debt balance of $350,795.85 on FNB Loan #6015.

24.     Further analysis of bank records for FNB #1895 show that from July 17, 2018, to August 20, 2020, a total of nine withdrawals were made via check from this account, payable to "CASH," as detailed below:

| Date | Amount |
|---|---|
| 7/17/18 | $13,391.22 |
| 9/4/18 | $10,269.06 |
| 9/4/18 | $19,898.00 |
| 10/10/18 | $8,160.00 |
| 12/13/18 | $30,000.00 |
| 4/17/19 | $68,590.64 |
| 7/3/19 | $8,470.00 |
| 7/30/19 | $72,514.25[3] |
| 8/20/20 | $6,917.04 |

25.     Each of the checks payable to "CASH" bears a signature that appears to read "JESSIKA L. HIEPLER." Each also contains an endorsement on the back that appears to be HIEPLER's. The "CASH" withdrawals made in HIEPLER's name total $238,210.21. The cash withdrawals, combined with the two checks to Merk Construction, totals $353,538.96.

26.     The images below are examples of the signatures used to negotiate the withdrawal checks from Post 34's FNB #1895 bank account, made out to "CASH."

---

[3] As more fully detailed below in Section VI, this $72,514.25 cash withdrawal by HIEPLER from Post 34's FNB account coincides with HIEPLER's purchase (through American Patriot Realty LLC) of a building owned by American Veterans Post 19.

[handwritten check images]

DDA Debits - 7/30/2019 - $72,514.25 - 2097291404 -
95431895 - 68

DDA Debits - 7/30/2019 - $72,514.25 - 2097291404 -
95431895 - 68

DDA Debits - 7/3/2019 - $8,470.00 - 2097053104 -
95431895 - 68

DDA Debits - 7/3/2019 - $8,470.00 - 2097053104 -
95431895 - 68

27.     For comparison, the image below depicts the digital signature captured on HIEPLER's Pennsylvania driver's license, which appears to match the signatures used for the withdrawals of $238,210.21 cash from Post 34's FNB #1895 bank account.



28.     Based on the investigation to date, including the interviews with eight members, leaders, and employees of Post 34, no expenditure relating to Post 34 has been identified that matches up with or explains the $238,210.21 in cash withdrawn from FNB #1895 by HIEPLER between 2018 and 2020. The use and purpose of these cash withdrawals by HIEPLER from FNB

8

#1895 have largely not been accounted for, apart from the $72,514.25 cash withdrawal by HIEPLER on July 30, 2019, which HIEPLER used to purchase real estate, see Section VI.[4]

29.　　According to J.C., the manager who replaced HIEPLER in November 2021, when Post 34 members asked HIEPLER about receipts for the loan money, HIEPLER claimed the records had been destroyed and were no longer available.

30.　　According to E.E.M., a longtime employee of Post 34, who was interviewed by the FBI in June 2022, HIEPLER always seemed to have more money than she should and E.E.M. cited examples including HIEPLER's multiple expensive cars, HIEPLER's swimming pool renovation at her home, and HIEPLER's purchase of a car for her nephew.

## II.　　**HIEPLER's Loan Payments**

31.　　The evidence also shows that HIEPLER made personal and student loan payments from Post 34's S&T bank account, totaling approximately $48,652.56.

32.　　According to HIEPLER's student loan records, as of 2017 and 2018, HIEPLER had over 30 outstanding student loans originating as early as 2001.  The loans were acquired through several Department of Education servicers, including NELNET, NAVIENT, and AES.  The loan statements issued by these student loan servicers were addressed to HIEPLER at her home address of 631 Hedgewick Drive, Lancaster, Pennsylvania.

33.　　Comparison of HIEPLER's student loan records with bank records for Post 34's S&T bank accounts revealed that HIEPLER used Post 34 funds to pay off at least 9 student loans in 2017 and 2018.  These payments totaled approximately $48,652.56.

---

[4] J.C. and J.V. reported that Post 34's employees were paid in different ways, including by cash, check, and direct deposit.  C.G., a bartender at Post 34 since 2015, stated there were 4 to 5 employees at Post 34, although J.C. and J.V. estimated as many as 10 to 11 employees.

34.     Specifically, bank records for Post 34's S&T bank account ending in #2668 ("S&T #2668") show the following electronic payments, totaling approximately $24,074.57, were made from this account to "ED NELNET LOANS PAYMENT":

    a.  $8,433.36 on March 7, 2017,

    b.  $6,481.70 on March 14, 2017,

    c.  $3,783.66 on March 29, 2017,

    d.  $2,849.09 on April 11, 2017, and

    e.  $2,526.76 on April 11, 2017.

35.     The S&T #2668 payments were compared to records received from NELNET student loan servicer for HIEPLER's student loan account ending in #3584.  During the same time period, NELNET credited $24,074.57 to HIEPLER's student loan account balance.

36.     Additionally, S&T records show that four more of HIEPLER's student loans were paid off in December 2018 using funds from Post 34's Building Fund Account with S&T Bank ending in #0369 ("S&T #0369"), totaling $24,577.99:

    a.  $3,469.63 to "NAVIENT PMT SPE" on December 21, 2018,

    b.  $7,750.00 to "Nelnet Loan Srv DENVER" on December 24, 2018,

    c.  $3,590.00 to "DEPT EDUCATION STUDENT LN" on December 24, 2018, and

    d.  $9,768.36 to "AES STDNT LOAN" on December 26, 2018.

37.     In total, between March 2017 and December 2018, a total of $48,652.56 was electronically disbursed from Post 34's bank accounts with S&T (#2668 and #0369) to pay off student loan accounts attributed to HIEPLER.

38.     Bank records for S&T #0369 also reflect multiple checks payable to "JESSIKA HIEPLER."  For example, check 1009 (as depicted below) in the amount of $20,000, is dated April 25, 2018, and contains the memo "Nov 2017 PIF Loan payoff."[5]



39.     A second check drawn on S&T #0369 (check 1097, as depicted below) was dated July 30, 2019, made payable to HIEPLER in the amount of $50,010.00.[6]



---

[5] Based on training and experience, your affiant understands that in the context of loans, PIF can be shorthand for "paid in full."

[6] As detailed more fully below in Section VI, this check withdrawal by HIEPLER from Post 34's S&B account coincides with HIEPLER's purchase (through American Patriot Realty LLC) of a building owned by American Veterans Post 19.

40.     Both of these checks were signed with a signature that appears to be identical to the digital signature from HIEPLER's Pennsylvania Driver's License, which is depicted above in Section II.

41.     According to the interviews conducted with J.A., J.V., and E.M., student loan repayment is not a benefit provided to Post 34 employees.  J.A., who served as Post Commander from 2021 to 2022, advised that HIEPLER's employment contract was renewed every five (5) years.  According to J.A., there were no benefits in HIEPLER's contract regarding tuition reimbursement or student loan repayments.  J.V., who was the Post 34 Commander from 2013 to 2014, was unfamiliar with the specific terms of HIEPLER's employment contract but stated that no one received tuition or student loan reimbursement as a benefit of working for Post 34.  E.M., the District 10 Commander, also was unaware of any student loan repayment as part of Post 34's compensation package.

## III.   Paycheck Protection Program Loans

42.     As set forth below, evidence shows that HIEPLER obtained the proceeds of two Paycheck Protection Program ("PPP") loans in the name American Legion Post 34, withdrew $24,400 in cash from the PPP funds, and then denied getting the PPP loans.

43.     When meeting with the FBI in January 2022, E.M. explained that his suspicions regarding HIEPLER were elevated after he learned in November 2021 that two "pandemic loans" had been issued in Post 34's name and purportedly disbursed to Post 34, but HIEPLER had denied that any government loans had been disbursed to Post 34.

44.     S.W., a Post 34 member and the former Post 34 Commander from 2019-2020, reported to the FBI that during the Post 34 membership meeting in October 2021, the financial status and potential closing of Post 34 was discussed, and HIEPLER made the following claims:

    a.  HIEPLER denied to the Board that Post 34 had received any PPP loans;

    b.  HIEPLER stated that Post 34's building needed several additional repairs; and

    c.  HIEPLER claimed that the denial of PPP assistance caused additional hardship and likely would result in the closing of Post 34.

45.    Contrary to HIEPLER's statements to the Post 34 Board, records obtained from the U.S. Small Business Administration (the "SBA") reflect that two PPP loan applications bearing HIEPLER's name and signatures were submitted, and PPP funds had been disbursed to Post 34.[7]

46.    The first PPP loan application for Post 34 was dated April 27, 2020, and the signature reads "Jessika Hiepler, Finance Officer." The handwritten initials "J.H." appeared next to each of the good faith certifications in the loan application. The PPP application stated that the average monthly payroll for Post 34 was $13,850 and listed "16" as the number of employees.[8]

47.    C.G., a bartender at Post 34 since 2015, stated there were 4 to 5 employees at Post 34, although J.C. and J.V. estimated as many as 10 to 11 employees. C.G. stated that Post 34's employees were not paid during the COVID pandemic closure, and the employees all collected unemployment benefits.

48.    Records obtained from SBA show that on April 28, 2020, a PPP loan in the amount $34,650 (Award ID #8252127205) was approved and issued by the SBA to Post 34 through lender First National Bank of Pennsylvania (FNB). SBA records also reflect that on April 29, 2020, a "U.S. Small Business Administration Paycheck Protection Program Note" was electronically

---

[7] According to the SBA's website, the purpose of PPP was to provide SBA-backed loans to help businesses keep their workforce employed during the COVID-19 crisis. PPP loan applications were submitted to the SBA for approval, with disbursement handled through an SBA-certified lender.

[8] Pursuant to the PPP Application form (SBA Form 2483), a borrower is eligible to request a loan equaling 2.5 times the average monthly payroll.

signed under HIEPLER's name, and the signer acknowledged receipt of the $34,650 loan on behalf of "Lancaster Post 34" and agreed to re-pay the loan at an interest rate of 1.00%.

49.     Records obtained from FNB regarding Post 34's business checking account ending in 3300 ("FNB #3300") show that a PPP loan totaling $34,650 was deposited on or about April 30, 2020, into this account, which was held in the name of "American Legion Post 34." According to FNB records, the sole signatory on the account at the time was HIEPLER. A further review of the FNB #3300 account revealed the following:

    a.  On or about June 25, 2020, a check (#5158) for $16,400 bearing HIEPLER's name was drawn on FNB #3300, payable to "CASH."

    b.  On or about January 6, 2021, a check (#5161) for $8,000 bearing HIEPLER's name was drawn on FNB #3300, payable to "CASH."[9]

50.     According to SBA records, a second PPP loan application was submitted for Post 34 on January 22, 2021. The electronic signature on the application reads "Jessika Hiepler, Treasurer." Next to each of the form's good faith certifications were the typed initials "J.L.H." and the contact email account provided was JLHIEPLER@Yahoo.com. The second PPP loan application stated that the average monthly payroll for Post 34 was $13,800 and listed "12" for the number of employees. The loan identified HIEPLER as a "female, service-disabled veteran" with 100% ownership interest in Post 34.

51.     Records obtained from SBA show that on February 10, 2021, the second PPP loan in the amount $34,457 (PPP Award ID #6416538302) was approved and issued to Post 34 by the SBA through FNB. SBA records reflect that on the same date, a "U.S. Small Business

---

[9] These cash withdrawals are separate from, and in addition to, the $238,210 in cash withdrawals made by HIEPLER from Post 34's FNB #1895 account.

Administration Paycheck Protection Program Note" was electronically signed under HIEPLER's name, and the signer acknowledged receipt of the $34,457 loan on behalf of "Lancaster Post 34 Home Association of the American Legion" and agreed to re-pay the loan at an interest rate of 1.00%.

52.      Records obtained from FNB regarding Post 34's non-profit interest checking account ending in #9550 ("FNB #9550) show that a PPP loan of $34,457 was deposited on or about February 10, 2021, into this account.  According to FNB records, FNB #9550 was held in the name of the "American Legion Post 34" and HIEPLER was the sole signatory on that account. The bank records reflect that between February 16 and March 17, 2021, $33,190 of these loan proceeds were transferred from Post 34's FNB #9550 to its FNB #3300.

53.      SBA records also reflect that on August 9, 2021, a PPP Loan Forgiveness Application Form (3508S) for the first PPP loan issued to Post 34, Award ID #8252127205, was electronically signed in the name of "Jessika Hiepler, Manager."   This application listed JLHIEPLER@yahoo.com as the contact email account.  The typed initials "jlh" appeared next to each of the certifications of accuracy.  The loan forgiveness application stated that Post 34 had "16" employees at the time of loan application (April 27, 2020) and indicated that Post 34 had only "6" employees at the time of the forgiveness application (August 9, 2021).  According to the loan forgiveness application, $10,147.88 of the PPP loan had been used for payroll costs during the time-period between April 30, 2020, and October 14, 2020, and forgiveness in the amount of $16.913.13 was requested.

54.      The loan records provided by FNB for Post 34's first PPP loan indicate that Post 34 paid approximately $2,466.34 towards the loan balance between December 2021 and March 2022, and that FNB waived all late fees.  On August 16, 2021, a total of $17,132.06 ($16,913.13

15

plus $218.93 in accrued interest) was credited to this account as "PPP Forgiveness" by the bank. On June 14, 2022, the remaining $15,639.76 was also credited as "PPP Forgiveness," leaving a loan balance of $0.

55.    Records obtained from the SBA show that on August 9, 2021, a PPP Loan Forgiveness Application Form (3508S) for the second PPP loan issued to Post 34, Award ID #6416538302, was electronically signed in the name "Jessika Hiepler, Manager." The typed initials "jlh" appear next to each of the certifications of accuracy. This application listed JLHIEPLER@yahoo.com as the contact email account. The loan forgiveness application stated that Post 34 had "12" employees at the time of loan application (January 22, 2021) and indicated that Post 34 had only "6" employees at the time of forgiveness application (August 9, 2021). The application further stated that $32,359.79 of the loan was used for payroll costs during the time-period between February 10, 2021, and July 27, 2021, and forgiveness in the amount of $34,457 was requested.

56.    The loan records provided by FNB for Post 34's second PPP loan indicate that on August 16, 2021, a total of $34,635.03 ($34,457 plus $178.03 in accrued interest) was credited as "PPP Forgiveness" by the bank, leaving a loan balance of $0.

## IV.    HIEPLER Co-mingled Funds

57.    As set forth below, evidence shows that HIEPLER co-mingled Post 34's funds with her personal funds and used Post 34 funds to operate her ATM business.

58.    During an interview with R.C., a longtime Post 34 employee who took over as Manager from HIEPLER in November 2021, the FBI learned that HIEPLER personally owned and operated two automated teller machines (ATMs) located at Post 34, along with two ATMs at the nearby AMVETS Post 19 building. R.C. reported that HIEPLER "re-stocked" the Post 34

ATM machines one to two times per week and received a fee for every transaction conducted on the ATMs.

59.     According to R.C., HIEPLER's ATM machine located in the rear room of Post 34 typically dispensed between $500-$1,000 per weekend and HIEPLER's ATM machine located in the front entry area of Post 34 typically dispensed between $2,000-$4,000 per week.  R.C. knew the amounts because HIEPLER often would ask R.C. to re-stock the ATM machines for her.  R.C. did not know where HIEPLER got the money to re-stock the machines.

60.     FNB records for a checking account in the name of "Jessika L. Hiepler dba JLH Financial Services" ending in #2018 ("FNB #2018") reflect that HIEPLER was the sole signatory on this account.

61.     FNB records also show that from March 23, 2018, through February 22, 2022, FNB #2018 received $1,154,160.00 in payments (1,076 transactions) from "MVNT DLY SETTLE."[10] These payments were made to HIEPLER's FNB #2018 account on a frequent, often daily, basis.

62.     FNB records show that over that same four-year period, withdrawals and payments were made from FNB #2018 in the following aggregate amounts:

        a.  $846,171 to American Legion Post 34
        b.  $118,200 in checks made out to "Cash" (all endorsed in HIEPLER's name)
        c.  $83,700 in cash withdrawals
        d.  $44,773 to HIEPLER
        e.  $30,100 to AMVETS Post 19

63.     Bank records for FNB #2018 also reveal that between 2018 and 2021, sixty-two (62) withdrawal or transfer transactions were conducted from HIEPLER's account which ranged

---

[10] According to open-source internet research, "MVNT DLY SETTLE" is linked to Metavante Corporation, which provides due diligence for private ATM owners/operators.  Bank statement transactions attributed to "Mvnt Dly Settle" from FNB #2018 account indicate that Metavante Corporation issued ACH deposits to settle the ATM daily transactions at the ATMs owned and operated by HIEPLER.

between $8,000 to $9,999.  The total dollar amount transferred within these 62 transactions was $569,080.

64.     Based on these records, there is probable cause to believe that HIEPLER co-mingled her personal funds with Post 34 funds, used Post 34 funds to stock and operate the ATMs she owned and profited from, and then recycled some of that money back to Post 34.

65.     After discounting the monies recycled back to Post 34 and Post 19, FNB #2018 records show that HIEPLER appears to have netted and withdrawn nearly $250,000 from her ATM operation at Post 34.

66.     On or about February 18, 2022, two days after her resignation from Post 34, FNB #2018 account was closed with a final withdrawal of $5,000.

67.     According to records obtained from the U.S. Department of Defense, HIEPLER served as a finance specialist in the U.S. Army from August 7, 1996, to January 5, 2004. Background checks and interviews also revealed that HIEPLER also owns multiple tax businesses, including, but not limited to, Hiepler's Tax Service LLC, Millersville Tax Service, Hiepler Financial Group LLC dba Cornerstone Tax Services, and Jessika L. Hiepler dba JLH Financial Services.

## V.     **HIEPLER'S Post-detection Conduct**

68.     As set forth below, evidence shows that after HIEPLER learned of Post 34's questions regarding her conduct, she removed files from Post 34's office, replaced Post 34's computer, closed Post 34's bank accounts, and opened new bank accounts.

69.     According to S.W. and J.A., during the October 2021 Post 34 Board Meeting, HIEPLER reviewed Post 34's financials and discussed the financial shortfalls leading to the potential closure of Post 34.

70.     The District 10 Commander, E.M., stated that following the October 2021 Board Meeting, the financial issues and discrepancies were elevated to his attention.  E.M. provided the FBI correspondence with from November 10, 2021, in which he requested from Post 34's Board/Local Leadership information and documentation related to Post 34's bank statements and accounts, loans including PPP loans, treasurer reports, investments, expenses, and other financial information.  E.M. informed the FBI that a week later, on or about November 17, 2021, he spoke directly with HIEPLER and asked her for copies of the same information.

71.     E.M. added that around the same time, in either late November or early December 2021, Post 34 re-hired R.C. to replace HIEPLER as Manager for Post 34 while HIEPLER remained on as Treasurer.

72.     R.C. told the FBI that shortly after R.C. took over as Post 34's new Manager, HIEPLER told R.C. that a desk drawer from the Manager's office was missing because the drawer had collapsed, and HIEPLER had taken the drawer home.  R.C. stated that the missing drawer is where Post 34's financial records from 2018 and 2019 were stored.  A photograph of the missing drawer of financial records is below:



73.     According to the Post 34 meeting minutes from February 16, 2022, when confronted about the missing drawer from the Manager's office, HIEPLER stated the cabinet got wet due to a roof leak and so she destroyed all the records. HIEPLER's claim of water damage appears to be contradicted by exterior and interior photographs taken of the cabinet, which do not reflect any water damage to the cabinet, rug, or files contained in the upper drawer. The lower drawer remains missing.

74.     R.C. also reported that on or about December 27, 2021, HIEPLER removed the computer tower from Post 34 and replaced it with a new computer. When R.C. asked HIEPLER what happened to the old computer tower, HIEPLER told R.C. that she had taken it to the dump. According to the Post 34 meeting minutes from February 16, 2022, when confronted about the missing computer tower by E.M., HIEPLER again stated the computer became inoperable and she

"took it to the dump." The meeting minutes show that HIEPLER also attempted to blame the new Manager, R.C., claiming the computer crashed after R.C. had keys to the Manager's office.

75.     Bank records also show that HIEPLER took actions in late 2021 that had the effect of making it difficult for Post 34 representatives to obtain historical banking information. Specifically, bank records show that in November 2021, HIEPLER opened two new bank accounts with Truist Bank in the name of Post 34. FNB records show that approximately one month later, HIEPLER closed the three FNB accounts belonging to Post 34.

  a.  On or about November 8, 2021, HIEPLER opened a checking account with Truist Bank titled "American Legion Post 34 Home Association Small Games Acct" with an account number ending in #6929 ("Truist #6929"). At the time of opening, the signers on this account were HIEPLER and J.A., the current Post 34 Commander. On  or about November 29, 2021, R.C. was added as a third signer.

  b.  On or about November 8, 2021, HIEPLER opened a checking account with Truist Bank titled "American Legion Post 34 Home Association Home Association" with an account number ending in #6937 ("Truist #6937"). At the time of opening, the signers on this account were HIEPLER and J.A., the current Post 34 Commander. On or about November 29, 2021, R.C. was added as a third signer.

  c.  On or about December 13, 2021, HIEPLER closed FNB #3300, which had been American Legion Post 34's primary operating account.

  d.  On or about December 13, 2021, HIEPLER closed FNB #9550, which had been American Legion Post 34's small games of chance account.

e.   On or about December 13, 2021, HIEPLER closed FNB #1895, which had

been American Legion Post 34's home association account.

76.     Based on my training and experience, the closure of Post 34's three FNB accounts

by HIEPLER, and the opening of new business accounts with a different institution, would have

made accessing and viewing the historical FNB records more difficult for Post 34's new Manager

and Financial Officer, or even prevented access altogether.

77.     The FBI also interviewed C.M., who was hired as Post 34's new financial officer

in February 2022, shortly after HIEPLER's resignation.  C.M. stated that he is a member of Post

34 and began attending membership meetings in October 2021, after hearing rumors of the

potential closure of Post 34.  C.M. also reported attending the meeting on February 16, 2022, where

he observed E.M. confront HIEPLER about Post 34's financials and missing records.

78.     C.M. reported approaching HIEPLER shortly after her resignation in his capacity

as Post 34's new financial officer, but HIEPLER refused to provide Post 34's bank account logins

and passwords to him.  C.M. stated that he later learned that there was a mechanic's lien on the

Post 34 property for unpaid bills related to the roof that had been replaced.  Additionally, C.M.

located letters and statements to Post 34 from the Internal Revenue Service ("IRS") regarding

unpaid taxes over the last several years.  C.M. explained that the IRS statements showed that Post

34 had been incurring penalties for delinquent tax filings in the amount of $1,060 per month.

According to S.W., Post 34 had reported an income of approximately $300,000 to $460,000 on tax

returns for several tax years leading up to 2019.

79.     C.M. reported that following HIEPLER's resignation on February 16, 2022, Post

34 became profitable again.  In January 2023, R.C. provided documentation to the FBI which

showed that by the end of 2022, Post 34 had $476,797.32 in profit from sales of food, alcohol, and other revenue and $138,589.10 in net sales from small games of chance.

## VI.   HIEPLER's Use of Post 34 Funds to Purchase the AMVETS Building

80.    Evidence summarized below shows that HIEPLER used Post 34's money to purchase the American Veterans Post 19 building.

81.    According to its website, American Veterans is a non-partisan, volunteer-led veterans' service organization representing the interests of 20 million veterans, with more than 250,000 members nationwide.  The American Veterans organization states that it has been serving veterans, their communities, their families, and their survivors for over 70 years, by providing assistance with employment, access to quality healthcare, and advocating for its members to safeguard veterans' entitlements.

82.    In January 2022, S.E., who was a member of American Veterans Post 19 in Lancaster, PA ("AMVETS" or "Post 19"), approached law enforcement to report possible mishandling of financial affairs of AMVETS by HIEPLER and her business partner, B.E., through the company that they operated, American Patriot Realty LLC.  AMVETS Post 19 was located at 715 Fairview Avenue, Lancaster, Pennsylvania.[11]

83.    S.E. and AMVETS' finance officer, B.H., provided information to the FBI about historical financial hardships encountered by AMVETS.  S.E. and B.H. stated that those hardships prompted the organization to take out a sizeable loan, which it was ultimately unable to repay.  As result, AMVETS was faced with a "balloon payment" of approximately $250,000 due in 2019.

---

[11] While both are veterans' service organizations, American Legion Post 34 and AMVETS Post 19 are distinct entities with no shared management, assets, property, or financial accounts.

84.     Per B.H., HIEPLER approached AMVETS and offered to assist it in resolving its financial issues, apparently claiming that she had helped American Legion Post 34 with similar financial strain.  According to AMVETS' Meeting Minutes from May 7, 2019, HIEPLER presented a "business plan" to the members of AMVETS, in which HIEPLER purportedly explained to Post 19 how to properly manage the non-profit organization.  According to B.H., the following proposal was made by HIEPLER to AMVETS:

        a.  HIEPLER offered to purchase the AMVETS building for $500,000 through her company, American Patriot Realty LLC.  This purchase would enable AMVETS to make the $250,000 balloon payment on its outstanding loan, and the remaining $250,000 (less closing costs and taxes) could be used by AMVETS to improve its financial condition.

        b.  HIEPLER stated that American Patriot Realty would then rent the building back to AMVETS.

        c.  HIEPLER stated that AMVETS could purchase the building back from American Patriot Realty at some point in the future.

85.     According to B.H., AMVETS agreed to this proposal.  As a result, an agreement of sale and settlement statement, both dated June 19, 2019, were executed.  The sale agreement and settlement paperwork were signed by AMVETS' Commander, D.R., as the seller, and HIEPLER, as the buyer, on behalf of American Patriot Realty LLC. The terms were consistent with the proposal that HIEPLER made to AMVETS on May 7, 2019.

86.     According to R.C., the members of American Patriot Realty LLC were HIEPLER, B.E. (also known as "B.M."), and R.C.[12]  R.C. reported that HIEPLER, B.E., and R.C. knew one another through their employment at American Legion Post 34.  R.C. agreed to help because she was under the impression that American Patriot Realty would be helping to financially "bail out" AMVETS Post 19.

87.     Documents obtained from Northwest Bank show that on June 21, 2019, a loan in the amount of $400,000 was issued to "Borrower" American Patriot Realty, LLC, Jessika L. Hiepler, R.C., and B.M. (a/k/a B.E.).  The security for the loan consisted of "a mortgage lien on, and security interest in, the property at 715 Fairview Avenue, Lancaster, PA 17603 [the AMVETS building] and all existing and future improvements."

88.     According to Post 34's FNB and S&T bank records, on July 30, 2019, the day before closing on the AMVETS building purchase, HIEPLER withdrew $72,514.25 in cash from American Legion Post 34's FNB #1895 account, and HIEPLER also withdrew an additional $50,010.00 from American Legion Post 34's S&T #0369 bank account.  (*See* Paragraphs 22 to 26, 38 to 39, above.)

89.     Bank records show that on the same date, July 30, 2019, HIEPLER remitted two checks to "Pro Settlements of PA" in support of closing the sale on the AMVETS building.  The checks are provided below:

---

[12] Though all three individuals are listed as members, only HIEPLER was a signer on the three FNB bank accounts for American Patriot Realty LLC.

*PSPA #2019-1045*





90.     As noted above in Section I, bank records show that HIEPLER withdrew $72,514.25 in cash from Post 34's FNB #1895 account on July 30, 2019, and on the same date, remitted the exact same amount to "Pro Settlements" to facilitate the closing of the AMVETS Post 19 building.

91.     As further noted above in Section II, on July 30, 2019, HIEPLER also withdrew an additional $50,010.00 from Post 34's S&T #0369 bank account, and on the same date, remitted $50,000.00 to "Pro Settlements" to facilitate the closing of the AMVETS Post 19 building in the form of an S&T Bank "Treasurer's Check."

92.     According to R.C. and B.H., on July 31, 2019, representatives from AMVETS Post 19 and American Patriot Realty LLC attended the closing for the sale of the AMVETS building. According to R.C., HIEPLER, B.E., R.C., HIEPLER's husband (J.C.), R.A. (AMVETS 1st Vice Commander), and B.H. were present at the closing. A review of the HUD-1 Settlement Statement from the sale shows the seller (AMVETS Post 19) was to receive $500,000 from the property sale. Of that amount, $100 was credited to an excess deposit and $278,424.64 was used to pay off AMVETS loans with PNC Bank (Loan numbers 606263951 and 608306553). The remaining cash due to the seller (AMVETS Post 19) was in the amount of $221,475.36.

93.     However, instead of being paid out to AMVETS, the HUD-1 Settlement Statement shows the $221,475.36 was disbursed to American Patriot Realty, LLC, as separately agreed in a "Proceeds Agreement" between AMVETS Post 19 and American Patriot Realty, LLC, dated July 31, 2019. R.C. stated that the cash due back to AMVETS was signed over to American Patriot Realty to pay off past due debts/liabilities.

94.     According to B.H., who served as the AMVETS' finance officer in the summer of 2019, AMVETS did not receive any of the approximately $221,000 cash that was due to the organization from the sale of their building. B.H. understood that these funds would be transferred to American Patriot Realty to cover debts and liabilities incurred by AMVETS, some of which were delinquent. B.H. estimated that AMVETS owed approximately $66,000 in debts at the time of closing on July 31, 2019. According to R.C., the estimated outstanding debts included an $8,000

water bill, $12,000 in state tax for liquor sales, and approximately $20,000 for a new HVAC system.

95.     Northwest Bank records show that on July 31, 2019, $221,475.36 was deposited into American Patriot Realty, LLC's Northwest Bank account ending in #4454 ("NB #4454"), which had a zero balance prior to this deposit.  The NB #4454 business account had been opened by HIEPLER, B.E., and R.C. on July 15, 2019, utilizing American Patriot Realty, LLC and 631 Hedgewick Drive, Lancaster, Pennsylvania (HIEPLER's residence) as the business name and mailing address.

96.     Northwest Bank records show that between August 5, 2019, and September 23, 2019, there were $220,112,96 in withdrawals/debits from NB #4454.  Significant transactions included the following:

a. On August 6, 2019, HIEPLER withdrew $72,524.25 from American Patriot Realty LLC's NB #4454 account.  On the same date, HIEPLER purchased a Northwest Bank cashier's check for $72,514.25, payable to "American Legion."



b. This check was deposited to American Legion Post 34's FNB #3300 account on August 6, 2019.

c. On September 10, 2019, HIEPLER withdrew $50,010.00 from American Patriot Realty LLC's NB #4454 account. On September 13, 2019, HIEPLER purchased a Northwest Bank cashier's check for $50,000.00, payable to "American Legion."



Tracer: 16022188 - Amt: $50,000.00 - 9/13/2019



Tracer: 16022188 - Amt: $50,000.00 - 9/13/2019

        d.   On September 13, 2019, the $50,000.00 check was deposited to Post 34's S&T #0369 account.

97.    B.H. told the FBI that AMVETS never received any money from the sale of its building to HIEPLER.

98.    According to B.H., beginning on the date that HIEPLER purchased the AMVETS building on July 31, 2019, HIEPLER assumed control over all financial aspects of AMVETS Post 19. HIEPLER conducted the bookkeeping and kept all records of AMVETS transactions until the date that AMVETS closed in February 2022. As HIEPLER did not have an office at the AMVETS building, B.H. is uncertain where HIEPLER conducted transactions on behalf of AMVETS or where HIEPLER stored AMVETS records. According to B.H., HIEPLER told B.H. that the computer which contained AMVETS QuickBooks transaction information "died" at the end of December 2021, so she got rid of it.

99.    Based on the analysis of bank records for American Legion Post 34 and AMVETS Post 19, during the time HIEPLER was in control of financial activities for both entities, it appears

that funds generated by Post 34 were improperly commingled with funds generated by AMVETS/American Patriot Realty LLC.

      a.   Checks were issued on Post 34 accounts which were used to pay expenses associated with AMVETS and vice versa.

      b.   According to C.M., Post 34's current financial officer, Post 34 has received bills for vendors that they do not use.

      c.   R.C., the manager for Post 34, reported observing that winners of small games of chance raffles at AMVETS were compensated with funds from Post 34 accounts.

100.    Pursuant to a lease agreement dated July 11, 2019, executed between HIEPLER and AMVETS, HIEPLER charged $5,000 in rent per month to AMVETS after she purchased AMVETS' property, which was significantly higher than the $500 to $700 per month proposed in HIEPLER's original business plan for AMVETS.  B.H. reported that when AMVETS could not afford the increased rent, HIEPLER filed lawsuits against AMVETS and evicted the organization from the property.

101.    According to S.E., the Judge Adjutant for AMVETS, Post 19 was forced to close its doors in February 2022, due to continued financial strain.

102.    Real estate records show that on or about August 9, 2022, HIEPLER resold the AMVETS building located at 715 Fairview Avenue, Lancaster, Pennsylvania, for approximately $1.95 million.

## PROBABLE CAUSE TO SEARCH HIEPLER'S YAHOO EMAIL

103. Based upon the evidence set forth below, there is probable cause to search Hiepler's Yahoo email account for evidence, instrumentalities, and/or fruits of the crimes described above.

104. According to records from both the SBA and FNB, HIEPLER's personal email address, JLHIEPLER@yahoo.com, was used in connection with the PPP loan applications submitted on behalf of Post 34, and JLHIEPLER@yahoo.com also was used on the PPP loan forgiveness applications.

105. According to C.M., some of the bills for Post 34 had been sent to HIEPLER's personal email address (JLHIEPLER@yahoo.com) instead of Post 34's mailing address. One example provided by C.M. was for a texting service that Post 34 utilized to communicate with its members.

106. According to a Liquor Control Board ("LCB") Enforcement Officer, L.S., he corresponded with HIEPLER via email regarding the ongoing investigation by LCB at American Legion Post 34. The email address HIEPLER utilized for these communications was JLHIEPLER@yahoo.com.

107. While searching the home office area of HIEPLER's residence on August 29, 2023, FBI agents located and accessed a desktop computer identified as belonging to HIEPLER (an HP all-in-one computer bearing S/N 2TK027004B). FBI agents observed that the HP computer was operating using files stored both locally on the computer itself and also files within the cloud-based Microsoft OneDrive ("OneDrive") account JLHIEPLER@yahoo.com. In viewing the main "OneDrive Settings" screen, FBI agents observed that 46.2 GB of data was being stored on the OneDrive account JLHIEPLER@yahoo.com. Several file folder names which were stored in OneDrive were consistent with entities listed in the residence search warrant. For example, file

folders titled "AMVETS", "APR", "Housing for Homeless Veterans Paperwork", "LEGION", and "Text Messages for Legion BS" were noted on HIEPLER's computer desktop as being stored in the cloud-based OneDrive account JLHIEPLER@yahoo.com.

108.    FBI agents previously issued preservation requests to both Microsoft and Yahoo. In general, an email that is sent to a Yahoo subscriber is stored in the subscriber's "mail box" on Yahoo's servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Yahoo's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Yahoo's servers for a certain period of time.

*         *         *

109.    In light of the evidence set forth above, there is probable cause to believe that HIEPLER committed the SUBJECT OFFENSES.  In addition, based on my knowledge of HIEPLER's activities, including interviewing her former co-workers and associates, conducting a search of her residence, and reviewing business and financial records, along with my training and experience in financial investigations, as well as the information that I have obtained from speaking with other law enforcement personnel, there is probable cause to believe that evidence, fruits, and/or instrumentalities of criminal violations of the SUBJECT OFFENSES listed in Attachment B will be located on HIEPLER's Yahoo email account.

## BACKGROUND CONCERNING EMAIL

110.    In my training and experience, I have learned that Yahoo provides a variety of on-line services, including electronic mail ("email") access, to the public.  Yahoo allows subscribers to obtain email accounts at the domain name yahoo.com, like the email account listed in Attachment A.  Subscribers obtain an account by registering with Yahoo.  During the registration process, Yahoo asks subscribers to provide basic personal information.  Therefore, the computers

33

of Yahoo are likely to contain stored electronic communications (including retrieved and unretrieved email for Yahoo subscribers) and information concerning subscribers and their use of Yahoo services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

111. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

112. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the

account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

113.    In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

114.    As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the

35

physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

115.    Based upon the foregoing facts, my training and experience, and the investigation conducted by myself and others, I request that the Court issue the proposed search warrant.

116.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Yahoo. Because the warrant will be served on Yahoo, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Angela Strause
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
On September ___, 2023.
22nd

Lynne A.
Sitarski

Digitally signed by
Lynne A. Sitarski
Date: 2023.09.22
16:49:04 -04'00'

Honorable Lynne A. Sitarski
United States Magistrate Judge

37

## **ATTACHMENT A**

### **Property To Be Searched**

This warrant applies to information associated with JLHIEPLER@yahoo.com that is stored at premises owned, maintained, controlled, or operated by Yahoo Inc. a company located at 391 San Antonio Road, Floors 5 and 6, Mountain View, California, 95040.

## ATTACHMENT B

### Particular Things To Be Seized

I.      **Information to be disclosed by Yahoo Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account from March 1, 2017 to present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

2

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within fourteen (14) days of issuance of this warrant.

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1957 (illegal monetary transactions), those violations involving JESSIKA HIEPLER ("HIEPLER") and relating to either the American Legion Post 34 ("Post 34") or American Veterans Post 19 ("AMVETS"), for time period between March 1, 2017 and present, including, for each account or identifier listed on Attachment A, information, records, and correspondence pertaining to the following matters:

(a) American Legion Post 34, AMVETS Post 19, American Patriot Realty, LLC, and Housing for Homeless Veterans, including records reflecting any ownership and control of these entities.

(b) The missing drawer from the filing cabinet in the Manager's Office of Post 34, and its contents, including Post 34's financial records from 2018 and 2019.

(c) The missing computer tower from the Office of Post 34, and its contents.

(d) HIEPLER's employment by or work for Post 34 or AMVETS.

(e) Any Paycheck Protection Program loans.

(f) HIEPLER's personal and student loans, or payments made to loans by HIEPLER.

(g) Financial transactions, including by cash, credit card, check, and other means.

(h) Real estate transactions, including leases, loans, and mortgages.

3

(i)  Ownership and operation of automated teller machines (ATMs).

(j)  Any audio or video surveillance equipment which captured activity inside or immediately outside the premises of the American Legion Post 34 or AMVETS Post 19.

(k)  Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner.

(l)  Evidence indicating the email account owner's state of mind as it relates to the crime under investigation.

(m) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.